IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RICK ONSTOTT, <br><br> Plaintiff, <br><br> v. <br><br> EQUINOX GOLD COAST, INC. D/B/A EQUINOX FITNESS CLUB, <br><br> Defendant. | Case No. 18-cv-4642 <br><br> Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Rick Onstott claims that his former employer, Equinox, discriminated against him based on his disability and discharged him in retaliation for reporting discrimination and harassment. Equinox has moved for summary judgment. For the reasons stated below, Equinox's motion for summary judgment [70] is granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 250 (internal quotations omitted).

1

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (*citing Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

## BACKGROUND[1]

**I. Onstott and His Employment with Equinox**

Equinox operates luxury full-service fitness clubs. (DSOF ¶ 1).[2] During Onstott's employment, there were four clubs in the Chicagoland area, each club having a general manager and an assistant general manager, as well as department

---

[1] The facts in this Background section are undisputed unless otherwise noted. Equinox's Rule 56.1 Statement of Facts (Dkt. 72) is abbreviated as "DSOF". Onstott's Rule 56.1 Statement of Facts (Dkt. 86, pp. 24-25) is "PSOF". Onstott responded to Equinox's Statement of Facts at Dkt. 86 and Equinox responded to Onstott's Statement of Facts at Dkt. 101.

[2] Onstott sued Equinox Gold Coast, Inc. d/b/a Equinox Fitness Club. In a prior filing [15] Equinox stated that the proper name should be Equinox Holdings, Inc., however, Equinox never moved to correct or replace the name on the docket.

2

managers, which might include fitness managers ("FMs"), personal training managers ("PTMs"), and Tier X managers. (*Id.* ¶ 3). Anyone sitting in club reports to the club's general manager, who in turn, reports to an area operations manager. (*Id.*). Area managers often report up to regional department managers. (*Id.*).

Onstott began his employment with Equinox on March 20, 2017 and worked as a Manager-in-Training ("MIT") at the Gold Coast club in Chicago, Illinois. (*Id.* ¶ 8).[3] Equinox maintains a MIT Program to help identify and train qualified candidates for a "seat" as a PTM or FM in one of Equinox's clubs. (*Id.* ¶ 7). Equinox developed a proprietary training curriculum for MITs, called the MIT Development Manual ("MIT Manual"), organized into seven units: relationship building, communication, management, leadership, technical skill, analytical skill and creativity. (*Id.* ¶ 11). Equinox provided MITs with copies of the MIT Manual and supporting materials. (*Id.*). (Onstott says he does not recall receiving any written MIT manual). (Dkt. 86 at 5). It was Onstott's understanding that an MIT could be in training for two to six months before being ready for a seat. Onstott also understood that Pongspikul expected him to focus on knowing the job as well as being able to show results so he could be placed anywhere. (DSOF ¶ 15).

Because of her role in overseeing his MIT training, Prima Pongspikul and Onstott communicated often. (*Id.* ¶ 10). Despite an initially friendly personal relationship between them, Onstott felt Pongspikul's training of him was inconsistent and choppy. (PSOF ¶¶ 3-4). On or about April 10, Onstott learned that the Loop club

---

[3] All dates herein are in 2017 unless otherwise noted.

3

rehired a former PTM. Onstott says he began to feel "extremely uncomfortable" and "uneasy" in May after Pongspikul told him that a former PTM had returned to the position at the Loop club because it meant there was only one PTM (Gold Coast) position open instead of two, and Onstott and Kristi Burris, then Gold Coast FM, believed they would both be seated as PTMs. (DSOF ¶ 20).

Onstott was first diagnosed with HIV in the late 1990s at the age of 25. He has been HIV positive for over 21 years. (*Id.* ¶ 16). Onstott had no symptoms of HIV while working at Equinox. (*Id.* ¶ 19). In early June, Onstott disclosed his positive HIV status to Pongspikul, due to their friendly relationship. (PSOF ¶ 5; Onstott Decl. (Dkt. 86-1, Exh. 4) ¶ 5). However, Pongspikul's reaction to his disclosure made Onstott feel uncomfortable. (PSOF ¶ 5). After Onstott informed Pongspikul that he wanted to speak with Human Resources (HR), Onstott spoke to HR Director, Jenny Hanson, in July, although he says that Hanson cut their conversation short. (*Id.* ¶¶ 8-9).

**II. Onstott's Termination**

On July 13, Pongspikul sent Onstott an email describing a plan based on a conversation they had on July 10 and listing expectations for Onstott. (DSOF ¶ 24). On July 24, Pongspikul requested a meeting with Onstott and General Manager Jonathan Domoleczny to discuss how Onstott was doing with the July action plan. (*Id.* ¶ 26). However because of continuing concerns with Onstott's performance, Domoleczny and Pongspikul decided to issue Onstott a written warning with an action plan—a "Record of Discussion" (ROD). (*Id.* ¶ 29). Hansen and Chicago Area PTM Travis DeSisso approved the decision, and Domoleczny, Pongspikul, and

4

Susannah Biamonte drafted the ROD. (*Id.*).[4] On August 1, Domoleczny and Pongspikul presented Onstott with the ROD. (PSOF ¶ 10; *see also* Dkt. 73, Exh. D-3). In drafting the ROD and identifying expected areas of improvement, Domoleczny, Pongspikul, and Biamonte relied heavily on the curriculum in the MIT Manual. (DSOF ¶ 30). Domoleczny, Pongspikul, and Biamonte drafted the ROD so that Onstott would be able to showcase some of the things that he was already doing well and demonstrate progress in the areas where he struggled with the MIT curriculum. (*Id.*). The ROD was titled, "Reason for Record of Discussion: Unsatisfactory Performance & Written Warning with Action Plan." (Exh. D-3).

On September 7, Pongspikul recommended that Onstott's ROD be extended to September 20, due to his unexpected absences as a result of his mother's health. Biamonte, Hansen and DeSisso agreed with Pongspikul's recommendation. (DSOF ¶ 35). Equinox terminated Onstott's employment effective September 23. (*Id.* ¶ 42).

**III. Onstott's Claims**

In his Amended Complaint (Dkt. 25), Onstott alleges that Equinox discriminated against him based on his disability in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq*. (Count I), and discharged him in retaliation for reporting discrimination and harassment (Count II). (The Court previously dismissed Counts III and IV with prejudice and defendant Pongspikul was terminated as a party. (Dkt. 39)). Equinox denies Onstott's allegations and maintains

---

[4] Onstott disputed DSOF ¶¶ 24 and 29 but did not dispute the particular factual assertions in DSOF ¶¶ 24 and 29 described here. (Dkt. 86 at 10, 12-13).

5

that he was discharged for failing to demonstrate proficiency in Equinox's Manager-in-Training curriculum.[5]

## ANALYSIS

**I. ADA Discrimination**

**A. Discharge**

"The ADA prohibits employers from discriminating against qualified individuals due to a disability." *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 798 (7th Cir. 2018) (citation omitted).[6] "To prove a violation of section 12112(a), a plaintiff must show that: 1) he is disabled; 2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; 3) he suffered an adverse employment action; and 4) the adverse action was caused by his disability." *Kurtzhals v. Cty. of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020) (citation omitted).

To establish causation and survive summary judgment, "a plaintiff must show a genuine issue of material fact exists regarding whether his disability was the 'but for' reason for the adverse action, in this case termination." *Monroe v. Indiana Dep't of*

---

[5] Equinox contends that Onstott violated Local Rule 56.1 by failing to controvert undisputed facts or responding with assertions unsupported by the record citations. (Dkt. 102). The Court agrees that in some instances Onstott failed to comply with Local Rule 56.1 and mischaracterized the evidence (one example being Onstott's response to DSOF ¶ 40 (Dkt. 86 at 18) when compared to Pongspikul's deposition testimony, pp. 149-150). The Court also notes that Equinox failed to comply with the rule by filing replies to Onstott's responses to Equinox's Rule 56.1 statement (Dkt. 101). *See* LR 56.1(a); *Kozlowski v. Fry*, 238 F. Supp. 2d 996, 1000 n.2 (N.D. Ill. 2002); *Cent. States v. Sara Lee Bakery Grp., Inc.*, 660 F. Supp. 2d 900, 908 (N.D. Ill. 2009). The decision to require strict compliance with Local Rule 56.1 is in the Court's discretion. *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019). The Court addresses particular statements of fact or evidence in the opinion as is necessary.

[6] The Court agrees with Equinox that a separate rule is not applied on summary judgment in employment cases. *See Bagley v. Blagojevich*, 646 F.3d 378, 389 (7th Cir. 2011).

*Transportation*, 871 F.3d 495, 504 (7th Cir. 2017). In other words the causation question asks: "could a reasonable juror conclude that he would not have suffered the same adverse employment action if he were not disabled and everything else had remained the same?" *Kurtzhals,* 969 F.3d at 729 (citation omitted).[7]

Equinox does not dispute, for purposes of this motion, that Onstott had a disability or that his discharge was an adverse employment action. Equinox argues, however, that Onstott was not qualified to perform the essential functions of his job and his disability did not cause his discharge. (Dkt. 71 at 11). According to Equinox, Onstott was discharged because he was not meeting expectations, and in particular he failed to become proficient in the MIT curriculum after six months of training. (*Id.* at 7, 12).

"[T]o establish a prima facie case of disability discrimination, [plaintiff] [] must establish that she was meeting [the employer's] legitimate expectations." *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 491 (7th Cir. 2014). Equinox provides evidence that Onstott was not meeting expectations. Domoleczny's email on July 30 gave feedback about Onstott's performance to Pongspikul, stating that in

---

[7] Onstott argues that the Court should employ a "substantial or motivating factor" standard rather than the "but for" standard. (Dkt. 87 at 6, 8). Courts continue to apply the "but for" standard to claims that disability caused the adverse action (*Kurtzhals*, 969 F.3d at 728-29; *McCann v. Badger Mining Corp.*, 965 F.3d 578, 588 (7th Cir. 2020)). Although the Seventh Circuit recently noted that "it remains an open question in this circuit whether that change [in the ADA Amendments Act of 2008] affects the 'but for' causation standard we apply in these cases," *Kurtzhals*, 969 F.3d at 728, Onstott has not cited any controlling case law that the standard has changed. And in *Ortiz*, the Seventh Circuit clarified that the focus should be "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Onstott relies on *Taylor-Novotny* which discussed causation for an ADA *retaliation* claim. 772 F.3d at 495. Even assuming that Onstott's burden for the retaliation claim is to show his protected activity was a "substantial or motivating factor" for his discharge, that claim still does not survive summary judgment as explained below.

7

moving into August, "[w]e should allow him to prove [he knows the business] and either sink or swim…This is Rick's 'Prove It' month." (Pongspikul Decl. (Dkt. 73), Exh. B-17). After Onstott was instructed in July to shadow Lincoln Park PTM Cameron Habel, Habel provided an assessment of Onstott's performance after a month with Onstott. (*Id.*, Exh. B-20).[8] On a scale of 1 to 5 (1 being "needs improvement", 3 "average" and 5 "exceeds expectations"), Habel gave Onstott a "2" for competencies, a "3" for growth, and a "2" for "PT Business Knowledge." (*Id.*) In that final category Habel noted that "Rick not only struggles with putting the information together but also presenting it to those that need it." (*Id.*). Burris, FM at the Gold Coast club, also expressed concerns about Onstott's work performance. DSOF ¶¶ 37-38.[9] In response, Onstott relies on his own testimony that he was meeting expectations, but his "own opinion about his work performance is irrelevant." *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 897 (7th Cir. 2015).

Onstott also fails to raise a genuine issue of fact that his disability caused Equinox to discharge him. To attempt to establish the causal link, Onstott relies on circumstantial evidence in the form of suspicious timing and pretext. (Dkt. 87 at 8). *See Monroe*, 871 F.3d at 504 (circumstantial evidence of causation can include "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in

---

[8] Although Onstott responds that DSOF ¶ 24 is "controverted" because he argues the July email was not specific to his performance and was not an "action plan", he does not dispute that Pongspikul directed Onstott to set weekly meetings with Gold Coast FM Burris and GM Domoleczny and to shadow Habel. (Dkt. 86 at 10).

[9] Onstott disputed DSOF ¶¶ 37-38 but did not dispute the particular factual assertions in DSOF ¶¶ 37 and 38 described here. (Dkt. 86 at 16-17).

8

the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.").

As to suspicious timing, Onstott disclosed his HIV status to Pongspikul in early June 2017, and Equinox discharged him September 23, 2017. That is approximately three and a half months between his disability disclosure and termination. That is much more than the usual "few days" generally required to survive summary judgment on suspicious timing alone. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012).

The other circumstantial evidence Onstott relies on in addition to suspicious timing would not permit a reasonable juror to infer discrimination. First, Onstott contends that Pongspikul did not have issues with his work performance until after he disclosed his HIV status. (Dkt. 87 at 9). However Onstott does not dispute that as early as May, he complained to Pongspikul about her management style. (DSOF ¶ 22). Thus the evidence does not support that the tension between Onstott and Pongspikul began only after he disclosed his HIV status.

Still, Onstott argues that Pongspikul's attitude toward him "got worse" after he disclosed his HIV status. (Dkt. 86 at 9). But he does not cite any evidence to show that Pongspikul's increasingly critical or rude tone was based on his HIV status. "Remarks can raise an inference of discrimination when they are (1) made by the decision-maker, (2) around the time of the decision, and (3) in reference to the adverse

9

employment action." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 885 (7th Cir. 2016) (citations and quotations omitted). Pongspikul's inquiries about Onstott's HIV status occurred in June and July, at least two months before the termination decision. (DSOF ¶¶ 47, 48). Onstott agrees that Pongspikul's inquiries about his HIV status occurred in June and July. (Dkt. 86 at 20).[10]

Two other remarks that Onstott relies on also occurred at least two months before Equinox decided to terminate him: (1) Pongspikul asking Onstott's boyfriend if he knew Onstott was HIV positive,[11] and (2) Domoleczny saying that he would have put Onstott "in the seat" but Pongspikul was holding it up. (PSOF ¶¶ 6-7). These remarks do not reference Onstott's discharge and were all made at least two months prior to his termination. Further, the statement by Domoleczny does not even reference Onstott's HIV status.

Finally and perhaps most significant, it is undisputed that Pongspikul was the only one of the four people who made the decision to terminate Onstott who knew about his HIV status. (DSOF ¶ 44). *See Bagwe*, 811 F.3d at 886; *Davis v. Time Warner Cable of Se. Wisconsin, L.P.*, 651 F.3d 664, 673 (7th Cir. 2011) (no inference of

---

[10] Onstott argues that Pongspikul "continuously inquired about Onstott's HIV status, his HIV doctor, and his viral loads," citing to his deposition. ((PSOF ¶ 5); Onstott Dep. (Dkt. 86-1), p. 148)). But he did not testify that Pongspikul "continuously" inquired about his HIV status. (Onstott Dep., p. 148). He testified that "she would bring [his HIV status] up…she researched it. She started talking about viral loads.") (*Id.*). And his testimony limits her inquiries to June and July timeframe.

[11] Onstott has filed a motion to reopen discovery related to Matt Taylor Onstott's Affidavit. For the reasons discussed below that motion is denied. Assuming that Matt's statement about Pongspikul approaching him is admissible, it does not create a genuine issue of fact about any of Onstott's claims.

10

discriminatory intent where plaintiff did not present evidence that rumors continued at the time of his termination or that individuals consulted about termination were motivated by anything other than belief that plaintiff was violating employee guidelines). These statements taken together would not allow a reasonable jury to conclude that the decision to terminate Onstott was based on his disability.

As to pretext, "the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge. Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Monroe*, 871 F.3d at 505 (citations and quotations omitted); *see also Bagwe*, 811 F.3d at 883 ("we do not sit as a 'superpersonnel department[ ]' that judges the wisdom of [the employer's] decisions") (citation omitted). The feedback of Domoleczny, Habel, and Burris that Onstott was not meeting expectations all support Equinox's argument about the reason for Onstott's discharge.

Onstott argues, however, that there is evidence of pretext in HR's alleged refusal to talk to him about Pongspikul. Onstott told Pongspikul that he wanted to talk to HR about her rude tone and behavior, but once Onstott mentioned Pongspikul's name to HR, he was cut off and told they would not discuss Pongspikul. (PSOF ¶¶ 8-9). Onstott urges the Court to infer from this that "Hansen and Pongspikul discussed Onstott's complaint prior to Onstott's call, preventing him from making a formal complaint." (Dkt. 87 at 9). Onstott's belief that Pongspikul and Hansen spoke with the intent to prevent him from making a complaint of discrimination is solely based

11

on his own speculation. (Dkt. 86 at 11). *See Boss v. Castro*, 816 F.3d 910, 919 (7th Cir. 2016) ("speculation is not evidence."). Even if the Court could reasonably make that inference, Onstott fails to show any connection to his discharge two months later. Onstott does not provide any evidence that Hansen knew of his HIV status, and he admits that of the four people who decided to discharge him, Biamonte, Yording, Pongspikul, and DeSisso, only Pongspikul knew about his HIV status. (DSOF ¶ 44).

Onstott also argues that he never saw the MIT Manual, though he insists he was "doing everything contained in the MIT manual." (Dkt. 87 at 6). The evidence he relies on shows that he simply *did not recall* receiving the manual. (Onstott Decl. ¶13; Onstott Dep. p. 224). Further, in an email from Onstott to Pongspikul in May, Onstott states that he was "working on MIT review." (Pongspikul Decl., Exh. B-11). In any event, Onstott does not explain how not receiving the MIT Manual creates a genuine issue of material fact that his discharge was based on his disability.

Finally, Onstott stresses that he did not interpret the July plan to be an "action plan" and did not understand that the ROD could lead to his termination. On July 13, Pongspikul sent Onstott an email describing a plan and expectations for Onstott based on a conversation they had on July 10. (DSOF ¶ 24; Pongspikul Decl., Ex. B-15, Ex. B-16). Although Onstott argues that this email did not reference an "action plan", in the follow up email to Onstott on July 24 (cc'ing Domoleczny and Habel), Pongspikul requested a meeting with Onsott and Domoleczny to discuss specifically how Onstott was doing with "your July action plan." (Pongspikul Decl., Ex. B-16).[12]

---

[12] Onstott's argument also contradicts his own testimony that he remembered being "on an action plan." (Onstott Dep. p. 336).

12

About one week later, the August 1 ROD made it clear to Onstott that he was not meeting expectations. Although he contends that no one told him he could be fired if he did not comply with the ROD and the ROD was described to him as a "learning tool" (Dkt. 86 at 13), he does not dispute that he received the ROD during a meeting with Pongspikul and Domoleczny and the ROD was read aloud to him. (PSOF ¶ 10; Dkt. 86 at 12-13; Onstott Decl. ¶ 15). The language of the ROD belies Onstott's argument. It states in relevant part:

> Reason for Record of Discussion: Unsatisfactory Performance & Written Warning with Action Plan.
> *Rick Onstott has not met the expectations of an Equinox employee as it relates to company standards regarding performance.* Specifically, Rick has not demonstrated proficiency in all MIT curriculum. Below is an action plan pulled directly from our MIT Handbook. These are the actionable items we will be looking for in August based on Rick's opportunities. Equinox values you as an employee, and it is your leadership team's intent to make you fully aware of this situation and to assist you in improving your work performance. However, it is important that you realize the responsibility to improve is yours alone…. ALL items must be complete and will be reviewed with Rick at the conclusion of August….
> *Consequences if unsatisfactory performance/behavior occurs again*: Following Equinox guidelines and meeting Equinox performance standards is part of your responsibility while employed with the company. Any deviation from these standards may result in *further disciplinary action, up to and including termination of employment.*

(Exh. D-3, emphasis added).

Thus the evidence Onstott relies on does not show his discharge was caused by his disability, but rather by not meeting Equinox's expectations. *See Jones v. Dep't of Children & Family Servs.*, 2018 WL 5776331, at *6 (N.D. Ill. Nov. 2, 2018) (record showed plaintiff "was disciplined and ultimately discharged for failing to meet legitimate employment expectations, not due to his disability.").

13

**B. Hostile Work Environment**

Equinox also moves for summary judgment on Onstott's hostile work environment claim. A plaintiff bringing a claim of hostile work environment must present evidence that: "(1) [he was] subject to unwelcome harassment; (2) the harassment was based on [his] [disability]; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability." *Ford v. Marion Cty. Sheriff's Office*, 942 F.3d 839, 856 (7th Cir. 2019) (citation and quotations omitted).[13] "This is a demanding standard; a plaintiff's evidence must go well beyond showing rudeness or incivility…, even if it need not reach the point of 'hellishness.'" *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 973 F.3d 718, 728 (7th Cir. 2020) (citations omitted). Generally employers "do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018).

Onstott argues in a conclusory fashion that the harassment was "so severe and pervasive as to alter the conditions of his employment." (Dkt. 87 at 6). The incidents he appears to rely on for this claim are that Pongspikul sent him home once because he had a cough, she did not allow him to work once because he cut his finger, she interrupted his training and assigned him underperforming trainers, and made statements about his HIV status. (*Id*. at 9-11). He argues that this interfered with his ability to perform his job and caused him emotional issues. (*Id*.). But these

---

[13] Hostile work environment claims under the ADA apply the same standard as under other employment discrimination laws. *Id*.

incidents do not rise to the level of being so severe or pervasive as to alter the conditions of his employment. *See Swyear*, 911 F.3d at 881 ("Although we recognize the environment at Fare Foods was at times inappropriate and offensive, we do not believe [plaintiff] has met this high bar [to show a hostile work environment]."); *Ford*, 942 F.3d at 856-57. And other than Pongspikul's inquiries about his HIV, Onstott does not provide any evidence that any of the incidents occurred because of his disability. *See Boss*, 816 F.3d at 920 (plaintiff was not subjected to insults based on his protected status and he "was not physically threatened or humiliated, and much of the 'interference' with his job was…reasonable: it stemmed from his own failure to meet legitimate employment expectations."); *see also Moens v. City of Chicago*, 805 F. App'x 421, 423 (7th Cir. 2020), reh'g denied (July 21, 2020) (plaintiff failed to present evidence that her supervisors harassed her *because of* her medical conditions).

Onstott has not shown that there is a genuine issue of material fact about his hostile work environment claim. Summary judgment is warranted on that claim.

**II. Retaliation**

"In order to make out a case of retaliation a plaintiff must show that: 1) he engaged in statutorily protected activity; 2) he suffered an adverse action; and 3) there was a causal link between the two.…the critical point is to offer evidence that would allow the factfinder to conclude that the employer took the adverse action because of the protected activity." *Pierri v. Medline Indus., Inc.*, 970 F.3d 803, 808 (7th Cir. 2020) (citation omitted). "[T]he legal standard under which we must analyze [plaintiff's] claim 'is simply whether the evidence would permit a reasonable factfinder to

15

conclude that [plaintiff's complaints] caused the discharge.'" *Rowlands*, 901 F.3d at 801 (quoting *Ortiz*, 834 F.3d at 765). Equinox argues that Onstott's retaliation claim fails on the first and third elements—because he admitted that he never complained of discrimination or harassment and cannot demonstrate a causal link between any protected activity and his discharge. (Dkt. 71 at 9-10).

Onstott responds that he "did complain to Prima Pongspikul, a direct superior, about her treatment of him and when she did not change her harassment of him, that he wanted to inform Human Resources." (Dkt. 87 at 7). However the testimony he relies on does not show that he complained that she was discriminating against him based on his HIV status. (Dkt. 86 at 3; Onstott Dep. at p. 170). Nor does he cite any other evidence that he complained to her or anyone else at Equinox that he was being discriminated against based on his disability. "A plaintiff must [] produce evidence of an adverse employment action that was instigated by [his] 'complaining *about prohibited discrimination*.'… [he] must produce evidence that [he] gave 'a cognizable expression of opposition' to discriminatory practices." *Jaburek v. Foxx*, 813 F.3d 626, 633 (7th Cir. 2016) (emphasis added) (citations omitted); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006); *cf. Davis*, 651 F.3d at 674 (plaintiff complained to supervisor of being unfair and treating his white subordinates more favorably than his African American ones).

As to his alleged complaint to HR, Onstott begins by arguing he "was not aware of how to contact Human Resources." (Dkt. 87 at 9). But he does not contend that Pongspikul or anyone else prevented him from contacting HR either before or after

16

his conversation with Hansen at the end of July. Instead the record shows that on July 25, Pongspikul provided Onstott with Hansen's email and phone number. (Dkt. 73, Exh. D-6). The same day Onstott emailed Hansen asking to set up a time to discuss "my MIT experience/program" and his "concerns," and Hansen suggested speaking the next day. (*Id*.). Crediting Onstott's testimony that he was cut short in his conversation with HR, he still has not provided evidence that Equinox knew that he was complaining about discrimination.[14] "An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints." *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) ("It is not sufficient that Patterson *could* or even *should* have known about Luckie's complaints; she must have had actual knowledge of the complaints for her decisions to be retaliatory.") (emphasis in original).

Even if Onstott's complaints to Pongspikul and/or Hansen qualify as protected activity, Onstott has not shown any genuine issue of fact that these complaints caused his discharge. He received the ROD on August 1, about one week after attempting to complain to HR, and then he was terminated at the end of September. According to Onstott, "[t]his shows there is suspicious timing between Pongspikul's complaints of

---

[14] The emails between Hansen and Pongspikul, attached to Onstott's sur-response (Dkt. 107-1), show only that Pongspikul requested to talk to Hansen on July 25. They do not give rise to a reasonable inference of discrimination or retaliation against Onstott. And Hansen's contemporaneously-made notes show that during the July 25 call with her, Pongspikul and Domoleczny, they discussed only that Onstott was not meeting work expectations and Hansen gave advice for how to hold Onstott accountable. (Dkt. 111, Exh. H-10).

17

Onstott's performance and his subsequent termination." (*Id.*). That is not the test for retaliation. The test is whether there is a causal link between *Onstott's complaints of discrimination* and his termination. The fact that Pongspikul's complaints about Onstott's performance are connected to his termination makes sense in light of the record evidence showing Equinox's dissatisfaction with his performance. Indeed "suspicious timing alone is rarely enough to survive summary judgment particularly when 'there are reasonable, non-suspicious explanations for the timing of [the] termination.'" *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 711 (7th Cir. 2017) (citation omitted). Here, there is significant evidence that Onstott was not meeting Equinox's expectations and Equinox attempted to work with him to improve his performance, including the ROD that made clear to Onstott the consequences if he did not meet Equinox's expectations.

In sum, viewing the evidence as a whole and making all reasonable inferences in Onstott's favor, he has not established a triable issue of fact about discrimination or retaliation. The record evidence shows that Onstott's relationship with Pongspikul began cordially and progressively became more tense as Onstott was not meeting company expectations. While Onstott was understandably offended and uncomfortable by her reaction to his disclosure of his HIV status, the evidence does not show that Pongspikul or Equinox discharged him because of his disability or his alleged complaints of discrimination or created a hostile work environment.

18

**IV. Onstott's Motion to Reopen Discovery**

More than eight months after the summary judgment motion was filed, Onstott filed a motion to reopen discovery [112]. The basis for the motion is that Onstott believes Mr. Taylor-Onstott, his ex-husband, might have forged his signature on his affidavit submitted in this case (Dkt. 86-1, Exh. 5). The Taylor-Onstott affidavit was submitted by Onstott in opposition to summary judgment. Onstott seeks to depose Mr. Taylor-Onstott "assuming he can be found" as he has apparently left that state. (Dkt. 112). Equinox responded to Onstott' motion, agreeing that discovery should be reopened, but even more broadly, to investigate the alleged forgery of the affidavit, and positing that revised summary judgment briefs may be needed depending on the outcome of discovery. (Dkt. 114).

Neither party has convinced the Court that any further discovery is needed in this case. *See Ty, Inc. v. Publications Int'l, Ltd.*, 2003 WL 21294667, at *6 (N.D. Ill. June 4, 2003) (decision to reopen discovery is in the court's discretion). Neither party deposed Mr. Taylor-Onstott before the close of discovery (the deadline for which the Court extended on multiple occasions). The facts contained in Mr. Taylor-Onstott's affidavit are generally already covered by other testimony such as Onstott's deposition, and in any event nothing in the affidavit raises a genuine issue of material fact about any of Onstott's claims. Onstott's motion to reopen discovery [112] is denied.

## CONCLUSION

For the stated reasons, Defendant Equinox's motion for summary judgment [70] is granted. Onstott's motion to reopen discovery [112] is denied. The Clerk is directed to enter judgment in Defendant Equinox's favor and this case is terminated.

E N T E R:

Dated: November 12, 2020

MARY M. ROWLAND
United States District Judge